**In the matter of Martin M. BRADY and Angela A. Brady, Debtors.**

**No. 06–18922/JHW.**

United States Bankruptcy Court, D. New Jersey.

Feb. 13, 2007.

Pamela A. Hulnick, Esq., Hackensack, NJ, Counsel for eCAST Settlement Corporation.

Scott M. Zauber, Esq., Subranni, Ostrove & Zauber, Atlantic City, NJ, Counsel for the Debtors.

Donna L. Wenzel, Esq., Office of the Chapter 13, Standing Trustee, Cherry Hill, NJ, Counsel for the Chapter 13 Trustee.

William Mackin, Esq., Woodbury, NJ, Henry J. Sommer, Esq., National Assoc. of Consumer Bankruptcy Attorneys, Philadelphia, PA, Tara Twomey, Esq., National Assoc. of Consumer Bankruptcy Attor-

neys, Washington, D.C., Counsel for Amicus Curiae NACBA.

## OPINION

JUDITH H. WIZMUR, Chief Judge.

The debtors have filed a Chapter 13 plan that proposes to make payments for 36 months, primarily for the benefit of their secured creditors, with a de minimis dividend to unsecured creditors. An unsecured creditor and the Chapter 13 Standing trustee have each objected to the plan's confirmation. They contend: (1) that the debtors' future projected disposable income should be determined by Schedules I and J; (2) that the debtors' applicable commitment period dictates the length of the debtors' plan, and (3) that the debtors must provide for a step up in their plan payment after satisfying one of their secured claims through the plan. In response, debtors contend that they are not required to pay anything to the unsecured creditor body because their disposable income, as calculated on Form B22C, is negative, and that the "applicable commitment period" under section 1325 does not mandate the length of the debtors' Chapter 13 plan if there is no disposable income to distribute to the unsecured creditors. Because I conclude that the statute, as amended, dictates the manner in which disposable income is calculated for above median income debtors, and because the debtors do not have disposable income to apply to unsecured creditors, the objections to confirmation are overruled, and the debtors' Chapter 13 plan may be confirmed.

### FACTS

Martin and Angela Brady filed a voluntary joint petition for relief under Chapter 13 of the Bankruptcy Code on September 20, 2006. The debtors scheduled $205,713.89 in secured debt and $87,100.48 in unsecured debt. The debtors' secured claims include a first mortgage and two automobile loans. Their unsecured debt is comprised entirely of credit card debt.

As part of their bankruptcy filing, debtors completed Form B22C, also known as the "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income".[1] The debtors' current monthly income, averaged over the six months preceding the filing, was $8,184.16. The debtors' allowable expenses, calculated by reference to national and local Internal Revenue Service ("IRS") standards, was $8,752.63. Form B22C showed a monthly excess of expenses over income of $568.47.[2]

In Schedules I and J of their petition, the debtors listed their actual income and expenses as of the filing date, showing a positive monthly surplus income of $590.45. The debtors' income was the same as the income noted on Form B22C, but the debtors' expenses were less than the expenses which they deducted on Form B22C. The debtors offer this monthly surplus income as the basis for the payments they will make under their proposed Chapter 13 plan. Debtors propose to pay administrative expenses (for counsel fees), mortgage arrears and two car payments through their plan, leaving approximately $9 a month to be distributed pro rata to their unsecured creditors.[3]

---

1. Form B22C, the form by which the "means test" is calculated under 11 U.S.C. § 707(b), is also used to determine the amount of "disposable income" an above median income Chapter 13 debtor has available to pay to unsecured creditors in his/her plan. 11 U.S.C. § 1325(b)(3).

2. Debtors filed an amended Form B22C on December 31, 2006 showing an excess of expenses over income of $ 602.07.

3. Debtors' plan proposes a total payout of $21,240.00. Counsel fees total $3,000.00 and secured claims total $15,876.40, including a proposed payout of a claim held by Quorum FCU that is secured by one of the debtors'

eCAST Settlement Corporation filed an objection to the confirmation of the debtors' proposed plan on November 25, 2006. eCAST, as assignee of GE Money Bank JC Penney Consumer, GE Money Bank Lowe's Consumer and HSBS Bank Nevada NA/HSBC Card Services, Inc., and as agent for Bank of America/FIA Card Services, formerly MBNA, holds approximately 47% of the debtors' scheduled unsecured debt. The Chapter 13 trustee joined in the eCAST objection. The National Association of Consumer Bankruptcy Attorneys ("NACBA") appears in this matter as amicus curiae in support of the debtors' proposed plan.

## DISCUSSION

This case is governed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective on October 17, 2005. The dispute concerns the application of 11 U.S.C. § 1325, as amended by BAPCPA. More specifically, the parties contest the meaning of the phrases "projected disposable income" and "applicable commitment period" in the amended version of section 1325(b), as applied to the factual circumstances of this case. Here, we have debtors with an above median income who have calculated their disposable income for purposes of Form B22C as a negative number, while their surplus income, as calculated on their Schedules I and J, is positive. On these facts, we must determine the required length of the debtors' Chapter 13 plan, and what payment, if any, the debtors are required to dedicate to their unsecured creditors.

Section 1325 of the Bankruptcy Code addresses the requirements for confirmation of a debtor's Chapter 13 plan. Subsection (a) mandates plan confirmation if certain specified requirements are met. Subsection (b) is effected "[i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan." 11 U.S.C. § 1325(b). To place the amendments to section 1325(b) in proper context, we will compare the pre and post amendment versions of the section.

### A. Pre–BAPCPA

Prior to the amendment of section 1325(b), if the trustee or an allowed unsecured creditor objected to confirmation of the debtor's plan, then the court could not confirm the plan unless the creditor received full value for its claim or the plan provided that "all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B) (2005). "Disposable income" was defined as that "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2) (2005).

Thus, where an objection to a plan was filed by the trustee or an unsecured creditor, pre-BAPCPA practice required the debtors to contribute their projected disposable income to the plan for a mandatory period of three years. The court could approve a longer period, but could not approve a period that was longer than five years. 11 U.S.C. § 1322(d) (2005). As explained in one leading treatise, in order to determine the debtor's "projected disposable income" pre-BAPCPA, courts embarked on:

---

vehicles. Debtors' plan states that the remainder of any monies will be paid pro rata to the unsecured creditors. The Chapter 13 trustee calculates that amount to be approximately $9.00 per month.

a two step process. First, the court must project the debtor's income over the next three years. To some extent this task is, of course, impossible. The court has no way of knowing whether debtors will continue to work at their current incomes, or whether they will be laid off or become disabled or suffer other diminutions of income. The court does not even know whether the debtor will live for three years.... As a practical matter, unless there are changes which can be clearly foreseen, the court must simply multiply the debtor's current monthly income [as indicated on Schedule I] by 36 and determine whether the amount to be paid under the plan equals or exceeds that amount.

8 Lawrence P. King, Collier on Bankruptcy, ¶ 1325.08[4][a] at 1325–50.10 (15th Ed. Rev.2006).

After it has projected the debtor's income for three years, the court must then determine how much, if any, disposable income the debtor will have during that period. "Disposable income" is defined in section 1325(b)(2)(A) for debtors not engaged in business, as income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor....

The determination of disposable income may be even more difficult than that of projected income. As with projected income, the court, in theory, is required to project what will happen to the debtor's expenses over three years. Such a projection would require the

court to guess whether the debtor would have additional children, unexpected marital separations, medical bills, home repairs, or a wide variety of other future expenses. Obviously, this is impossible. As with the income side of the budget, the court must simply use the debtor's current expenses [as indicated on Schedule J], unless a change in them is virtually certain.

*Id.* at ¶ 1325.08[4][b] at 1325–53.

Under prior practice, the court would simply utilize the debtors' income and reasonable expenses as listed on Schedules I and J to determine the debtors' disposable income. That amount would be projected forward by multiplying it times the number of months in the debtors' plan, with flexibility to accommodate for "virtually certain" changes, and would be dedicated to the debtors' plan.

### B. *Post–BAPCPA*

The BAPCPA amendments to section 1325 made several significant changes to the manner in which the debtor's income and expenses are calculated to determine plan payments. As with the pre-BAPCPA provision, subsection (b) comes into play only if the trustee or an unsecured creditor objects to the confirmation of the debtors' plan. As amended, section 1325(b)(1)(B) specifies that the plan may not be approved unless it "provides that all of the debtor's *projected disposable income* to be received in the *applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan."[4] 11 U.S.C.

---

4. Section 1325(b)(1)(B) provides:
(b) (1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan-

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning

§ 1325(b)(1)(B) (emphasis added). The meaning of the highlighted terms is the focus of the dispute presented here.

### 1. *Projected Disposable Income*

■ eCAST and the Chapter 13 trustee both contend that the disposable income calculated on Form B22C serves merely as a starting point to determine the actual disposable income that will be projected forward over the life of the plan to be applied to unsecured claims. They submit that the "disposable income" calculation on Form B22C should be adjusted to factor in the actual surplus income that results from comparing the debtors' Schedules I and J. They point out that the term "disposable income" is defined in section 707(b) in historical terms, and that Congress, by modifying "disposable income" with the term "projected", intended consideration of the debtors' future projected income beyond the Form B22C calculation. The trustee believes that the debtors should be required to pay the excess income shown on their Schedules I and J into their proposed plan for five years, the debtors' applicable commitment period.

The debtors maintain that the plain language of section 1325(b)(2), as amended by BAPCPA, clearly defines "disposable income" by a fixed and inflexible formula, eliminating the opportunity of the court to modify the debtors' surplus income by factoring in the income and expenses listed on Schedules I and J. If the application of the formula indicates that there will be no surplus income available to apply to the unsecured debt, then the debtors contend that they are not required to make any such payments through their plan regardless of the applicable commitment period.

As the parties have noted, the bankruptcy courts have employed a variety of approaches to address the question of what is meant by the phrase "projected disposable income". See *In re Edmunds*, 350 B.R. 636 (Bankr.D.S.C.2006) (describing approaches). Some courts follow a strict application of the statute, concluding that "projected disposable income" must be calculated by reference to section 707(b) of the Code. See, *e.g.*, *In re Miller*, 361 B.R. 224 (Bankr.N.D.Ala.2007) ("Form B22C is dispositive with respect to an above-median income debtor's 'projected disposable income.' "); *In re Farrar–Johnson*, 353 B.R. 224, 227–28 (Bankr.N.D.Ill.2006) ("Schedule J is not relevant to the determination of disposable income when a debtor's income is above the median"); *In re Guzman*, 345 B.R. 640, 642 (Bankr. E.D.Wis.2006); *In re Alexander*, 344 B.R. 742 (Bankr.E.D.N.C.2006); *In re Barr*, 341 B.R. 181 (Bankr.M.D.N.C.2006). Other courts have concluded that Form B22C merely provides the starting point, creating a rebuttable presumption of the debtor's projected disposable income. See *In re Foster*, No. 05–50448 HCD, 2006 WL 2621080, *5 (Bankr.N.D.Ind. Sept.11, 2006); *In re Fuller*, 346 B.R. 472, 483 (Bankr.S.D.Ill.2006); *In re Jass*, 340 B.R. 411, 415 (Bankr.D.Utah 2006) ("the word 'projected,' . . . obviously has independent significance," and so "the number resulting from Form B22C is a starting point for the Court's inquiry only"). See *also In re Teixeira*, 358 B.R. 484 (Bankr.D.N.H. 2006); *In re Risher*, 344 B.R. 833, 837 (Bankr.W.D.Ky.2006) (Form B22C "represents a floor, not a ceiling."); *In re Grady*, 343 B.R. 747, 750 (Bankr.N.D.Ga.2006) ("If Congress wanted the plan payment amount under section 1325(b)(1)(B) 'to be synonymous with section 1325(b)(2)' defini-

on the date that the first payment is due under the plan will be applied to make pay-

ments to unsecured creditors under the plan.

tion of disposable income, then 'projected' would have been deleted from section 1325(b)(1)(B)."). A third approach requires that the debtor factor in his or her actual expenses and use the debtor's actual disposable income, as reflected in Schedules I and J. See In re Hardacre, 338 B.R. 718, 722 (Bankr.N.D.Tex.2006).

▇ All of the cases cited recognize that the proper application of section 1325 necessarily begins with an examination of the statutory language itself. See Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) ("The starting point in discerning congressional intent is the existing statutory text."); Toibb v. Radloff, 501 U.S. 157, 160, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991); United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("all such inquiries must begin with the language of the statute itself"). Where the statutory language is plain, "the sole function of the courts, at least where the disposition required by the text is not absurd, is to enforce it according to its terms." Hartford Underwriters Ins. Co. v. Union

Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (citations omitted).

The phrase "projected disposable income," is not defined under the Code. The term "disposable income" is defined as the "current monthly income received by the debtor ... less amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." [5] 11 U.S.C. § 1325(b)(2). "Current monthly income" is defined as the average income from all sources, other than Social Security and certain other payments, that the debtor receives during the 6 month prepetition period. 11 U.S.C. § 101(10A). In this case, it is not disputed that the debtors' annualized current monthly income is greater than the median income for a family of four in New Jersey. If the debtors' annualized current monthly income exceeds the appropriate state median family income [6], then the "[a]mounts reasonably necessary to be expended" by the debtors which may be deducted from the debtors' current monthly income is determined, pursuant to section 1325(b)(3), "in accordance with subparagraphs (A) and

5. Section 1325(b)(2) provides:

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A) (I) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4))) in an

amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

6. Section 1325(b)(3) provides in part:

(3) Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than—

. . .

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals.

(B) of section 707(b)(2)." 11 U.S.C. § 1325(b)(3).[7] The deductible expenses under subparagraphs (A) and (B) of section 707(b)(2) are based upon the national and local standards for certain expenses as regulated by the IRS, plus the debtors' actual expenses for specific categories of expenses.

■ For above median income debtors, BAPCPA has supplanted the pre-BAPCPA practice of assessing the reasonableness of the debtors' actual expenses, as they are reflected in Schedule J. There is no discretion woven into the statute to substitute the debtors' Schedule J expenses for the section 707(b) standardized formula for the calculation of applicable and actual expenses. The amended Code now provides express direction as to the particular expenses, and the amount of those expenses, that can be deducted from the debtors' current monthly income to calculate their "disposable income".

■ Pursuant to section 1325(b)(1)(B), the resulting calculation of "disposable income" is then "projected" over the debtors' applicable commitment period. The parties dispute what Congress intended by using the modifier "projected" before the term "disposable income". The simple and direct meaning of the phrase, in the context of the provision that the plan must apply "all of debtor's projected disposable income to be received in the applicable commitment period . . . to make payments to unsecured creditors under the plan", is that the debtor's disposable income, as calculated under the statute, which is projected to be received over the course of the applicable commitment period, must be dedicated to the payment of the unsecured creditors. In this regard, the phrase "projected disposable income", did not change as a result of the BAPCPA amendments. Accordingly, pre-BAPCPA interpretations and practice continue to be instructive. As noted in *Colliers, supra*, the term "projected" requires the court to "project" forward the debtors' disposable income, as now defined under the revised Code, to determine the requisite payments to unsecured creditors under the plan.[8]

In this case, the debtors' disposal income, as calculated under the section 707(b) formula, is negative. The parties do not dispute the manner in which the section 707(b) formula has been calculated here. Because there is no disposable income shown on Form B22C, there is no disposable income to "project" to be received during the debtors' applicable commitment period in the plan. Therefore, there is no requirement that a payment to

---

**7.** If the debtor's annualized current monthly income is less than the appropriate state median income, then the court presumably maintains the discretion to assess the amounts reasonably necessary to be expended for the support of the debtor and the debtor's dependents. 11 U.S.C. § 1325(b)(2).

**8.** Although the phrase "projected disposable income" is the same pre and post BAPCPA, section 1325(b)(1)(B) has changed fundamentally in other ways, precluding resort to pre-BAPCPA practices otherwise. The pre-BAPCPA version of the statute required that all of the debtor's projected disposable income, based on the income and expenses in Schedules I and J, and calculated without reference to Chapter 13 administrative expenses or arrearages on secured or priority debts, be paid into the plan. The plan was confirmable over the trustee's objection if it provided for payment of all projected disposable income into the plan, regardless of what was paid to unsecured creditors. Now, the term "disposable income" for above median income debtors is based on an average of six months of income, and includes deductions for Chapter 13 administration and payment of arrearages to secured and priority creditors. 11 U.S.C. § 707(b)(2)(A)(ii)(III) and (iii). If any disposable income remains, it must be paid to unsecured creditors rather than "into the plan."

unsecured creditors be made through the debtors' plan in this case.

The surplus income shown on the debtors' Schedule I and J, while providing support for the feasibility of the debtors' plan, does not serve to modify the calculation of the debtors' projected disposal income according to the statute. The debtors show surplus income on Schedule J, but show negative income on Form B22C, for two reasons. First, Schedule J does not contain certain deductions authorized under section 707(b) to be deducted from current monthly income, including Chapter 13 administrative expenses and arrearages due to secured creditors. Second, in this case, the debtors have voluntarily reduced their actual expenses below the permissible and prescribed national and local IRS standards in order to propose a plan that will pay off arrearages to their secured creditors in 36 months, rather than over a more extended period.

 The notion that debtors who show surplus income on their Schedules I and J, but are not required to apply that surplus to the partial or complete satisfaction of the claims of unsecured creditors, appears to be at odds with the Congressional intent in enacting BAPCPA to " 'ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so.' " *In re Hardacre,* 338 B.R. 718, 725 (Bankr.N.D.Texas 2006) (quoting to 151 Cong. Rec. S 2470 (March 10, 2005)). The Supreme Court has instructed that "[i]n determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.' " *Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) (quoting *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980))). Here, we have unambiguous statutory language. While the legislative history does contain "clearly expressed legislative intent" to identify debtors who can afford to repay their debts, and to compel them to do so, Congress established very clearly the fixed formulas for identifying the debtors who can afford to repay their unsecured debts. Congress' chosen method of determining the debtors' disposable income must be respected. The statute must be applied according to its terms.

As one court has explained,

[a]lthough contrary to the stated purpose of BAPCPA and seemingly discriminatory against chapter 13 debtors with incomes below the median, the unambiguous language of the new statute compels but one answer: the above-median debtor's expense deductions are governed by Form B22C, not by Schedule J. If the above-median debtor's Form B22C contains enough deductions, the debtor will be entitled to obtain confirmation of a plan paying nothing to the unsecured creditors, even though the debtor's budget shows that excess funds are available.

*In re Guzman,* 345 B.R. 640, 642 (Bankr. E.D.Wis.2006).

Although the result of such enforcement is contrary to the popular notion that BAPCPA would require well-to-do debtors to repay as much of their debts as possible, strict application of § 1325(b)(3) dictates that in above-median cases, bankruptcy courts are no longer permitted to review the debtor's Schedule J to determine what expenses are reasonably necessary for the debtor's support, or to require that excess

Schedule I income over Schedule J expenses must be dedicated to the plan. *Id.* at 646. "While this provision of the new statute does not perform as advertised, perhaps prompting trustees, unsecured creditors and even some bankruptcy judges to long for the 'good old days' of reviewing Schedules I and J ... the mandate of new § 1325(b)(3) is clear." *Id.* See also *In re Grunert,* 353 B.R. 591 (Bankr. E.D.Wis.2006); *In re Alexander,* 344 B.R. 742 (Bankr.E.D.N.C.2006); *In re Barr,* 341 B.R. 181 (Bankr.M.D.N.C.2006).

The trustee and eCAST argue that a failure to consider the surplus income noted in Schedules I and J is a failure to afford full meaning not only to the term "projected" in section 1325(b)(1)(B), but also to other terms, including "as of the effective date" and "to be received". Some courts have opined that these terms signal the need to anticipate the debtor's income going forward, and that the prescribed section 707(b) formula, based partially on historic income figures during the six months prior to filing, may not reflect the debtor's current and anticipated financial circumstances. Each of these cases is factually distinguishable, presenting a substantial change in the debtor's income and expenses between the completion of Form B22C calculation and the consideration by the court of the objection to confirmation. *See, e.g., In re Teixeira,* 358 B.R. 484 (Bankr.D.N.H.2006) (debtor's income declined since the filing); *In re Grady,* 343 B.R. 747 (Bankr.N.D.Ga.2006) (debtor's income reduced pre-petition); *In re Renicker,* 342 B.R. 304 (Bankr.W.D.Mo.2006) (debtor's expenses increased substantially upon a move to another state); *In re Jass,* 340 B.R. 411 (Bankr.D.Utah 2006) (debtor's income on Form B22C, based on a six month average, was significantly higher than the income on Schedule I).

Here, the debtors' income and expense numbers have not changed. The debtors' income has remained constant during the six months preceding the bankruptcy filing and following the filing. There is no indication in the record of any change in the debtors' expenses. Nor is there a foreseeable change anticipated. While it is recognized that the BAPCPA revisions to section 1325(b) have generated a greater focus upon the term "projected", particularly where a debtor's financial circumstances have changed or are "virtually certain" to change during the plan, see *Colliers, supra,* adherence to the statutory formula is required where no such changes exist. The trustee's suggestion that the term "projected" should be infused with an expanded formulaic approach, requiring a calculation of the debtors' disposable income according to the section 1325(b)(3) definition, then comparing the disposable income to Schedules I and J and adjusting accordingly, particularly where income and expenses have not changed, is simply not justified by the language of the statute. See *In re Alexander,* 344 B.R. 742, 752 (Bankr.E.D.N.C. 2006) ("[T]he court's job is to interpret the new statute as clearly written, not to nostalgically preserve the past by seizing on isolated words such as 'good faith' and 'projected' and inflating their meaning beyond justification.") See *also In re Dew,* 344 B.R. 655, 660 (Bankr.N.D.Ala.2006) ("[I]f a debtor's income and expenses have been relatively constant and there is no reasonable expectation of substantial change or fluctuations ..., then projected disposable income and disposable income will in virtually all, if not all, cases be the same."). Absent a known or expected change in the debtors' income and/or expenses, Schedules I and J only provide a different snapshot of the debtors' financial circumstances at the time of the filing of the petition, and do not reflect more accu-

rately than any other formula the debtors' anticipated income going forward during the Chapter 13 plan.

I must also reject the contention of the trustee and the objecting creditor that when the debtors' car loan is satisfied in the 54th month of the plan, the debtors must step up their plan payments to devote the amount of the monthly car payments to their unsecured creditors, because their disposable income would then accommodate a higher payment. As noted, the debtors' disposable income was calculated, as required by section 1325(b)(3), with reference to section 707(b). In particular, section 707(b)(2)(A)(iii), as is relevant here, provides that the debtors may deduct from current monthly income "[t]he total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition ... divided by 60." In effect, the debtors' monthly car payment was calculated over a sixty month period, to determine whether a payment to unsecured creditors is required. There is no basis to adjust the computation when the contractual obligation of the monthly car payment is completed during the 60 month period.[9] The impact of the early payoff has already been factored into the Form B22C calculation.

Because the debtors do not have disposable income to be received during the applicable commitment period of their Chapter 13 plan, I conclude that the debtors are not required to make any payments toward their unsecured debt under their plan, and the objections suggesting otherwise are overruled.

## 2. *Required Length of the Plan*

eCAST and the Chapter 13 trustee also challenge the length of the debtors' proposed plan. The objectors contend that because the debtors' income exceeds the median income, their applicable commitment period is 60 months, requiring the debtors to make payments into their plan for five years. According to the trustee, the only option for above-median income debtors who are seeking a shorter plan term is to pay all allowed unsecured creditors in full, as provided in section 1325(b)(4)(B).

The debtors counter that their disposable income, as calculated on Form B22C, is below zero. A zero payment for 36 months or 60 months is still a zero payment to unsecured creditors. The debtors acknowledge that definitionally, the "applicable commitment period" as it pertains to them is five years, but submit that the statute does not specify or require a fixed plan duration. Rather, the applicable number of months is a multiplier to determine the amount of projected disposable income that must be paid to unsecured creditors.

As noted above, prior to the BAPCPA amendments, section 1322 provided that the debtor's plan "may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." 11 U.S.C. § 1322(d) (2005). Under section 1325(b)(1)(B), if the trustee or an unsecured creditor objected, the debtor was required to pay his/her projected disposal income over a three-year period into the plan.

**9.** It has recently been held that under section 707(b), an allowance for car ownership may be deducted from current monthly income to determine disposable income even though the debtors own their motor vehicle outright and thus have no actual vehicle ownership expenses. *In re Grunert,* 353 B.R. 591 (Bankr. E.D.Wis.2006).

Section 1325 was amended to remove the three-year requirement and to shift the focus from payments into the plan to payments to unsecured creditors. Debtors are now required to provide all of the projected disposable income that they will receive during the "applicable commitment period" toward payments to satisfy their unsecured debt. Under section 1325(b)(4)(A)(ii), the "applicable commitment period" for the debtors is "not less than 5 years", unless "the plan provides for payment in full of all allowed unsecured claims over a shorter period." [10] The debtors' plan here does not provide for payment in full of all allowed unsecured claims.

Bankruptcy courts have disagreed about whether the term "applicable commitment period" modifies the phrase "projected disposable income" in section 1325(b)(2) to require a multiplication of the debtor's disposable income projected over a specified period of time to determine the amount of payment required to unsecured creditors in the plan, or whether the term "applicable commitment period" constitutes a separate requirement that the debtor must commit to a plan for a specified length of time. *Compare In re Davis*, 348 B.R. 449 (Bankr.E.D.Mich.2006) (determines length of plan); *In re Schanuth*, 342 B.R. 601 (Bankr.W.D.Mo.2006) and *In re McGuire*, 342 B.R. 608 (Bankr.W.D.Mo.2006) *with In re Fuger*, 347 B.R. 94 (Bankr.D.Utah 2006) (debtors are not required to have a 60

month plan where their disposal income is negative) and *In re Alexander*, 344 B.R. 742 (Bankr.E.D.N.C.2006). The issue has been characterized as a distinction between a "monetary" requirement and a "temporal" requirement. Alane A. Becket and Thomas A. Lee, III, Applicable Commitment Period: Time or Money?, 25–MAR Am. Bankr.Inst. J. 16 (2006).

A contextual reading of the term "applicable commitment period" in section 1325(b)(1)(B) does not support the meaning suggested by the trustee and the objecting creditor, i.e., that the "applicable commitment period" mandates a minimum duration for Chapter 13 plans. The provision can only be read to mean that if the debtors have projected disposable income to be received during the five years that constitutes the debtors' applicable commitment period, then the debtors must apply that projected disposable income to unsecured creditors under the plan. While it is certainly true that the term "period" signifies a portion of time and may therefore be labeled "temporal", the phrase is only relevant to specify the length of time that a required payment of projected disposable income to unsecured creditors must be made. *In re Alexander*, 344 B.R. at 751. "[The applicable commitment period] simply does not come into play where no projected disposable income must be taken into account." *Id.* See *also*, 5 Keith M. Lundin, Chapter 13 Bankruptcy, § 500.1 at 500–2 (3d Ed.2006) ("The applicable com-

---

**10.** Section 1325(b)(4) provides in relevant part:

(4) For purposes of this subsection, the "applicable commitment period"—

(A) subject to subparagraph (B), shall be—

(I) 3 years; or

(ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—

. . .

(II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

. . .

(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

mitment period does not require that the debtor actually make payments for any particular period of time. Rather, it is the multiplier in a formula that determines the amount of disposable income that must be paid to unsecured creditors.")

To buttress the argument that the term "applicable commitment period" requires a mandatory plan length, bankruptcy courts have cited other Chapter 13 sections that have been modified under BAPCPA. For instance, section 1325(b)(4)(B) now provides that the "applicable commitment period" "may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period." This provision has been interpreted to mean that the plan must continue for 5 years unless unsecured claims are paid in full. See, e.g., In re McGuire, 342 B.R. 608 (Bankr. W.D.Mo.2006). Actually, the phrase "may be less than 3 or 5 years" refers to the definition of "applicable commitment period" rather than to the length of a Chapter 13 plan. There is no contest that the debtors' applicable commitment period is 5 years, and that the period may not be less than five years because the debtors' plan does not pay unsecured creditors in full. However, once established for the debtors, the applicable commitment period must then be read in the context of section 1325(b)(1)(B), as discussed above. If, as here, the debtors have no disposable income to apply to unsecured creditors' claims, then the length of the applicable commitment period is irrelevant.

Other statutory citations relied upon by bankruptcy courts to support the contention that debtors are now mandated to propose plans of minimum duration, per the "applicable commitment period", include sections 1322(a)(4), 1322(d)(2), 1326(b)(3)(B)(ii) and 1329(c). Section 1322(a)(4) permits a priority pre-petition domestic support obligation to be paid in less than the full amount due if the "debtor's projected disposable income for a 5 year period ... will be applied to make payments under the plan". Section 1322(d)(1) and (d)(2) specify the maximum length of a plan, but do not specify the minimum number of months required. Section 1326(b)(3) provides for compensation to a Chapter 7 trustee over the duration of the Chapter 13 plan, where that compensation remains unpaid in a case converted to Chapter 13. Section 1329(c), pertaining to the modification of a plan after confirmation, specifies that a modification "may not provide for payments over a period that expires after the applicable commitment period under section 1325(b)(1)(B), ... unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time." The modification clause simply ties the period during which payments may be made to the projected disposable income calculation contained in section 1325(b)(1)(B), and specifies that payments may not be made after 5 years. None of these sections provide for a mandatory minimum payment length for Chapter 13 plans where the debtor has no projected disposable income. Cf. In re Dew, 344 B.R. 655 (Bankr.N.D.Ala.2006).

The debtors' plan as proposed here extends for 36 months. The debtors are not required to pay a dividend to unsecured creditors because they have no disposable income within the meaning of the statute. As the Alexander court noted, there is no reason to extend the debtor's plan artificially to 60 months if no dividend is required to be paid to unsecured creditors. Alexander, 344 B.R. at 751.

I conclude that the plan proposed by the debtors, with plan payments devoted to

secured, priority and administrative expenses, may be confirmed. The objections to the plan are overruled. The debtors are directed to submit an order in conformance with this opinion.